**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re KEVIN JAMES MORRELL, | ) | Case No. 24-44713 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| KEVIN O'NEIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary Case No. 25-04009 |
| | ) | |
| KEVIN JAMES MORRELL, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF KEVIN O'NEIL'S SUPPLEMENTAL POST-TRIAL MEMORANDUM**

Plaintiff Kevin O'Neil respectfully submits this consolidated post-trial memorandum in response to the Court's questions at the conclusion of trial and in reply to the principal arguments raised by Defendant Morrell. The trial record established a straightforward but important proposition: Kevin Morrell furnished a Personal Financial Statement ("PFS") to support his personal guaranty and to induce O'Neil's $2.5 million loan; that PFS presented a materially misleading picture of Morrell's personal financial condition; O'Neil actually relied on that written presentation in deciding to proceed; and that reliance was reasonable under the totality of the circumstances. The resulting debt is therefore nondischargeable under 11 U.S.C. § 523(a)(2)(B).

**I.   Issue and Governing Rule**

Under 11 U.S.C. § 523(a)(2)(B), Plaintiff must prove that Defendant obtained money by use of a written statement respecting his financial condition, that the statement was materially false, that Plaintiff reasonably relied on it, and that Defendant caused it to be made or published with intent to deceive. *First Nat'l Bank of Olathe, Kan. v. Pontow*, 111 F.3d 604, 608 (8th Cir.

1

1997). The Eighth Circuit evaluates reasonable reliance under the totality of the circumstances. *Pontow*, 111 F.3d at 610; *Sinclair Oil Corp. v. Jones* (*In re Jones*), 31 F.3d 659, 662 (8th Cir. 1994). That inquiry includes whether there were red flags that would have alerted an ordinarily prudent lender to possible inaccuracy and whether even a minimal investigation would have revealed the problem. *Pontow*, 111 F.3d at 610; *In re Jones*, 31 F.3d at 662.

The reliance required by 11 U.S.C. § 523(a)(2)(B) is reasonable reliance, not merely justifiable reliance. *Field v. Mans*, 516 U.S. 59, 66-70 (1995). But the Eighth Circuit does not impose a categorical duty to independently verify every line item of every written financial statement. To the contrary, courts in this Circuit recognize that a creditor is not required to proceed as though every borrower is presumptively dishonest. *Rosen's, Inc. v. Ghere* (*In re Ghere*), 393 B.R. 209, 217 (Bankr. W.D. Mo. 2008).

Intent may also be inferred from the surrounding circumstances, because direct evidence of state of mind is rarely available. *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1287-88 (8th Cir. 1987). Against that governing framework, the Court's questions all resolve in O'Neil's favor.

## II.  Application to the Court's Questions

### A. The relevant question is whether O'Neil actually and reasonably relied on Morrell's PFS, not whether a hypothetical lender might have viewed it differently.

The Court's questions appropriately focused on whether Morrell's PFS truly mattered to O'Neil's decision, or whether it was merely a secondary document of the sort some lenders might collect without meaningful underwriting value. Under 11 U.S.C. § 523(a)(2)(B), however, the question is not what some hypothetical lender might have done. The question is whether this creditor actually relied on this written statement, and whether that reliance was reasonable under the totality of the circumstances. *Pontow*, 111 F.3d at 608, 610; *In re Jones*, 31 F.3d at 662.

2

That distinction matters because commercial decisions are rarely monocausal. A creditor may evaluate the project, the parties, the structure of the transaction, and the guarantor's financial strength at the same time. Those considerations are not mutually exclusive. Nothing in 11 U.S.C. § 523(a)(2)(B) requires the written financial statement to be the sole basis for the extension of money or credit. What matters is that the statement materially influenced the decision to proceed and formed part of the basis on which the creditor acted. Here, that is exactly what the record shows.

O'Neil did not simply loan money in an abstract development concept. He loaned $2.5 million in a transaction that included Morrell's personal guaranty. In that setting, Morrell's balance sheet was not collateral paperwork. It was the very thing that gave the guaranty practical significance. A guaranty from a person with represented net worth in excess of $42 million means something very different from a guaranty unsupported by personally owned assets. The Court should therefore analyze reliance through the lens the statute requires: whether O'Neil requested, received, and used Morrell's written statement of financial condition as part of his own risk analysis. On this record, the answer is yes.

**B. The record supports contemporaneous underwriting reliance, not the notion that the PFS was merely "pocketed" for later use.**

The structure and timing of the transaction answer the Court's concern that the PFS might have been treated as a file-stuffer or "bankruptcy insurance" document. Morrell provided the PFS during the inducement phase, before O'Neil parted with his $2.5 million. The PFS was furnished together with the personal guaranty that was intended to protect O'Neil if the transaction failed. That timing strongly supports contemporaneous reliance.

This case is unlike the Eighth Circuit decisions in which the creditor's own conduct showed disregard of the financial information it later claimed to have relied upon. In *Pontow,* 111 F.3d at

3

610, and in *In re Jones*, 31 F.3d at 662, the courts emphasized obvious warning signs and failures that undermined any assertion of reasonable reliance. Here, by contrast, the PFS was part of the transaction package before O'Neil committed funds. There is no comparable record that O'Neil ignored the PFS, discounted it, or treated it as meaningless.

Nor is there anything commercially unusual about a PFS serving both of its normal functions: first, as an underwriting tool when the creditor decides whether to proceed; and second, as a collection backstop if the deal later fails. Defendant's contrary theory would erase the ordinary function of a guarantor's financial statement in commercial transactions. The law does not do that. Where a guaranty is part of the inducement for the transfer of funds, the guarantor's written balance sheet naturally bears on the creditor's decision to proceed.

### C. The evidence of falsity is at least as strong as to the real property as it is to the personal property.

The same logic that demonstrates falsity as to personal property applies with equal, and indeed greater, force to the real property. The PFS did not present the primary residence, the secondary residence, and the 22-acre tract as marginal or uncertain items. It presented them as part of Morrell's balance sheet and as part of the net worth O'Neil was being asked to trust in accepting Morrell's personal guaranty. If, as Morrell later testified, those properties were actually Jane Morrell's or were owned solely by Jane's trust, that is not a technical drafting defect. It is a direct contradiction about ownership of major assets that naturally bear on net worth, solvency, and practical recourse.

The selective disclosures on the face of the PFS make the omission more serious, not less. The statement specifically identified only a small Fidelity asset as belonging to Jane or Jane's trust. That matters for a simple reason: it shows that Morrell knew how to denote separate ownership when he intended to do so. Having done that for de minimis assets, he cannot plausibly characterize

4

the failure to make the same disclosure for the primary residence, the secondary residence, and the 22 acres as immaterial or innocently imprecise. The natural reading of the PFS is that the major real-estate assets were being presented as Morrell's own assets, or at minimum as assets available to support the financial condition reflected in his guaranty.

That omission is material under 11 U.S.C. § 523(a)(2)(B). A guarantor's ownership of major real property is precisely the kind of information that would matter to a creditor assessing the value of a personal guaranty. The later effort to recharacterize those assets as someone else's does not reveal a harmless ambiguity; it reveals that the written statement gave O'Neil a materially distorted picture of Morrell's financial condition.

### D. The $700,000 personal-property category was also material in the context of this transaction.

The Court also asked whether the $700,000 personal-property figure was truly material. It was. Materiality under 11 U.S.C. § 523(a)(2)(B) is contextual. In a transaction involving a $2.5 million exposure and a personal guaranty, a $700,000 asset category is plainly significant to a creditor's evaluation of solvency, net worth, and secondary repayment capacity.

The personal-property entry was not a trivial side note. It represented approximately $700,000 in assets that contributed to the overall balance sheet Morrell asked O'Neil to rely upon. Defendant later took the position that essentially all the contents of the primary residence belonged to Jane, except for a few tools, a computer, and his clothes. That later testimony does not establish immateriality; it establishes contradiction. If the PFS represented a substantial category of personal assets as part of Morrell's financial strength, and Defendant later disavowed ownership of those same assets, the PFS necessarily conveyed a substantially misleading picture.

The nature of the assets also matters. The record reflects more than generic household décor. The category included items such as firearms, a gun safe, a golf simulator, Apple purchases,

and other substantial personal items. Whether some of those items were or were not ultimately collectible in liquidation is not the point. The point is that Morrell's PFS affirmatively used them to support his represented financial strength. A creditor evaluating a personal guaranty was entitled to consider them as part of the guarantor's net worth unless the PFS disclosed otherwise.

### E.  The blanks on the PFS were not red flags defeating reasonable reliance.

This issue is central because Morrell's primary response is that blank spaces on the PFS should have put O'Neil on notice not to rely. That argument overreads both the document and the governing law.

Under the Eighth Circuit's totality-of-the-circumstances approach, the Court asks whether there were red flags that would have alerted an ordinarily prudent creditor to likely inaccuracy, and whether even a minimal investigation would have revealed the falsity. *Pontow*, 111 F.3d at 610; *In re Jones*, 31 F.3d at 662. But a creditor is not required to perform an independent investigation of every written financial statement or to presume that every borrower who furnishes one is dishonest. *In re Ghere*, 393 B.R. at 215.

The blanks here were not red flags in the sense contemplated by *Pontow* and *In re Jones*. They did not affirmatively disclose that title to the major real-estate assets was held solely by Jane or by Jane's trust. They did not contradict the values shown on the face of the statement. They did not reveal that the principal assets making the guaranty meaningful were supposedly unavailable. To the contrary, the PFS supplied a precise overall net-worth figure, listed major asset categories, and selectively identified only a minor asset as Jane-owned. A reasonable creditor could read that document as complete in all material respects and could rely on it without inferring from silence that Morrell's most important assets supposedly belonged to someone else.

This case is also far removed from situations where the financial statement was facially so rough, incomplete, or internally ambiguous that reliance could not be reasonable. See *In re Keim*,

6

236 B.R. 400, 403 (B.A.P. 8th Cir. 1999). Morrell's PFS was not a hand-scribbled draft or a patently incomplete worksheet. It was a formal written financial statement prepared to support a personal guaranty in a significant transaction. Defendant's theory would effectively require O'Neil to disregard the formal statement and conduct an external title examination and trust analysis despite the very document that Defendant supplied to induce reliance. 11 U.S.C. § 523(a)(2)(B) imposes no such duty.

Indeed, the trust evidence reinforces Plaintiff's point. Morrell was not a stranger to the trust structure he now invokes; he was a trustee. The trust instrument gave the trustee broad authority with respect to trust assets. At a minimum, that evidence demonstrates why a creditor could reasonably rely on the formal PFS instead of presuming that listed assets were somehow outside the practical reach of the guarantor despite their inclusion on his balance sheet. The burden was on Morrell to disclose the ownership limitations he now asserts, not on O'Neil to reverse-engineer them from blank spaces.

### F. Intent to deceive may be inferred from the surrounding circumstances, and the surrounding circumstances here support that inference.

The final disputed element is intent. Direct proof of a debtor's state of mind is rarely available, so intent may be inferred from the surrounding circumstances. *In re Van Horne*, 823 F.2d at 1287-88. That principle fits this case.

Several surrounding circumstances support the inference of intent to deceive here. First, the PFS was not an informal conversation; it was a formal written statement prepared for a high-value transaction and supplied to support a personal guaranty. Second, the PFS selectively identified a minor asset as belonging to Jane or Jane's trust, while failing to make the same disclosure as to the much more significant real estate and personal-property categories. Third, after the transaction failed, Defendant advanced a materially different ownership narrative, disavowing

7

personal ownership of the very assets that made the guaranty meaningful. Fourth, the explanations offered at trial about ownership were neither consistent nor stable, including testimony showing uncertainty even within the Morrell household about what belonged to whom and what was held by which trust.

That pattern permits the inference that the omissions were not accidental. A person who knows how to denote separate ownership for small assets but omits the same disclosure for major assets on a personal balance sheet supplied to induce a multimillion-dollar loan, has at minimum acted with the level of deceptive intent that 11 U.S.C. § 523(a)(2)(B) forbids.

### III. Morrell's Contrary Themes Do Not Defeat O'Neil's Claim

**A. Selective accuracy and generalized "good faith" do not cure a materially misleading financial statement.**

Morrell argues, in substance, that the PFS was as accurate as he could make it and that some information on it was true. That does not answer the statutory question. A financial statement can contain some true information and still be materially misleading when, taken as a whole, it presents a distorted picture of the debtor's financial condition. Here, the problem is not that every line item was false. The problem is that the statement affirmatively conveyed a level of personal ownership and net worth that Morrell later disclaimed when it mattered.

Selective accuracy actually strengthens O'Neil's position. The PFS specifically carved out one small Jane-owned asset. That demonstrates knowledge of the distinction and the ability to make it. The omission of comparable disclosures for the primary residence, the secondary residence, the 22 acres, and the substantial personal-property category therefore cannot be dismissed as mere sloppiness.

**B. Morrell's project-centric framing fails because the guarantor's balance sheet still mattered.**

Morrell also argues that no rational creditor funds a deal of this size based on furniture or household contents. O'Neil does not contend otherwise. O'Neil's position is not that one asset category alone drove the transaction. It is that Morrell's written PFS mattered as part of the overall inducement package, particularly because the transaction included Morrell's personal guaranty. That is a far more modest and far more credible proposition.

A sophisticated creditor can consider both the economics of a project and the strength of a guarantor. In fact, that is precisely what commercial creditors do. Project returns and personal recourse serve different functions. The first addresses expected performance; the second addresses downside protection. Morrell's PFS was relevant to the latter, and therefore to O'Neil's decision to proceed.

**C. O'Neil was not required to unravel family title and trust arrangements that Morrell chose not to disclose.**

At bottom, Morrell's position asks the Court to shift the disclosure burden from the debtor to the creditor. Under that view, once a debtor supplies a formal PFS, the creditor must assume the statement may conceal undisclosed title defects, perform outside title work, analyze family trusts, and verify ownership despite the debtor's own written presentation. That is not the law in this Circuit. *Pontow*, 111 F.3d at 610; *In re Jones*, 31 F.3d at 662; *In re Ghere*, 393 B.R. at 215.

The law instead asks whether there were meaningful warning signs on the face of the statement or otherwise known to the creditor that made reliance unreasonable. There were not. The PFS was formal, facially substantial, and precise enough to include a net-worth figure and selective ownership disclosures. It did not warn O'Neil that the principal assets supposedly belonged to someone else. Under those circumstances, O'Neil's reliance was reasonable.

## Conclusion

The Court's questions ultimately point to the same conclusion. Morrell provided a formal written PFS to support his personal guaranty and induce O'Neil's $2.5 million loan. That PFS represented a level of personal ownership and net worth that Morrell later materially disavowed. The falsity is evident not only as to the $700,000 personal-property category, but at least as strongly as to the primary residence, secondary residence, and 22-acre tract. The blanks on the PFS were not red flags that defeated reliance; they were, at most, silence where Morrell now says disclosure should have existed. Under the Eighth Circuit's totality-of-the-circumstances approach, O'Neil actually and reasonably relied on the PFS, and the surrounding circumstances support the inference that Morrell published it with intent to deceive.

For those reasons, Plaintiff Kevin O'Neil respectfully requests that the Court enter judgment in O'Neil's favor and hold that Defendant Kevin Morrell's obligation to O'Neil is nondischargeable under 11 U.S.C. § 523(a)(2)(B).

10

Respectfully submitted,

/s/ David R. Keesling
David R. Keesling, OK Bar No. 17881*
Destyn D. Stanton, OK Bar No. 31718*
SOLOMON | ARIEH
401 S. Boston Avenue, Suite 2300
Tulsa, OK 74103
Telephone: (918) 631-7770
dkeesling@solomon-arieh.com
dstanton@solomon-arieh.com

and

Joe D. Jacobson #33715
JACOBSON PRESS P.C.
222 South Central Ave., Suite 550
Clayton, Missouri 63105
Direct: (314) 899-9790
Fax: (314) 899-9790
Office General: (314) 899-9789
Jacobson@ArchCityLawyers.com

*Attorneys for Plaintiff Kevin O'Neil*

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was filed electronically on the 14th day of April, 2026, with the United States Bankruptcy Court for the Eastern District of Missouri, and was served electronically upon all parties who have requested or are entitled to notice via the Court's CM/ECF System.

/s/ David R. Keesling
David R. Keesling

11