**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **In re:** | **Case No. 24-44713-357** |
| **KEVIN JAMES MORRELL,** | **Chapter 7** |
| **Debtor.** | |
| **KEVIN O'NEIL,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Proc. No. 25-04009-357** |
| **KEVIN JAMES MORRELL,** | |
| **Defendant.** | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this adversary proceeding, Plaintiff Kevin O'Neil seeks a determination that a certain debt owed by Debtor Kevin James Morrell is excepted from discharge under Section 523(a)(2)(B) of the Bankruptcy Code. The proceeding was tried to the Court on March 24, 2026. O'Neil was represented by Joe Jacobson of Jacobson Press P.C. and David Keesling and Destyn Stanton of Solomon Arieh. The Debtor was represented by David Dare of Herren, Dare & Streett.

At trial, Kevin O'Neil, the Debtor, and his wife, Jane Morrell, testified. Various exhibits offered by the parties were admitted into evidence. Both parties submitted post-trial briefs on April 14, 2026.

Based on the evidence and other matters of record, the Court makes the following **FINDINGS OF FACT**:

A.      At some point in January 2021 or earlier, O'Neil's financial advisor introduced him to the Debtor in connection with an investment opportunity (Tr. 24:6–7, 33:7–19). The

Debtor, on behalf of GS Vista LLC, was seeking funds to complete an apartment project (Tr. 57: 23–25, 58:1).

B.      O'Neil has invested in twenty to thirty similar apartment projects (Tr. 31:3–7). He clearly is a sophisticated real-estate investor, with a career spanning 40 years (Tr. 20:1–4, 31:8–9). At the time of trial, his investment portfolio exceeded one billion dollars (Tr. 20:17–21).

C.      On January 19, 2021, O'Neil invested $2.5 million in GS Vista LLC and signed the related operating agreement, for which he received a Class A membership in the company (Tr. 7:12–17, 8:3–5, 18–21). As a Class A member, O'Neil was entitled to receive the return of his principal and 12% interest over the following three years (Tr. 9:15–18).

D.      The Debtor, as a Class B shareholder of GS Vista LLC, also signed the operating agreement on or around January 19, 2021 (Tr. 11:12–14, 66:19–21).

E.      Before agreeing to invest, O'Neil received and reviewed a personal guaranty executed by the Debtor, the Debtor's financial statement, and GS Vista LLC's operating agreement (Tr. 7:10–14). These documents formed the basis of his decision to invest in GS Vista LLC (Tr. 7:15–17). He did not review project-specific documents such as site plans, drawings, and projections before he invested (Tr. 35:22–25).

F.      Through his personal guaranty, the Debtor agreed to be personally liable for GS Vista LLC's debt to O'Neil (Tr: 86:14–25). The Debtor's personal guaranty was important to O'Neil because it served as a fallback in the event the investment did not work out (Tr. 14:2–7). O'Neil understood that if GS Vista LLC was unable to pay O'Neil as promised, he could proceed directly against the Debtor (Tr. 14:11–15).

G.      The Debtor's financial statement was material to O'Neil's decision to invest (Tr. 17:16–21). He would not have invested if he were aware that the assets listed on the Debtor's financial statement did not belong to him and were not available to satisfy his personal guaranty (Tr. 26:4–8).

H.      At the top of the financial statement, there are two boxes labeled "Individual Information" and "Joint Party Information" (Exh. 2). The Debtor put "Kevin Morrell & Kevin J Morrell Revocable Trust" and "Jane M. Morrell" in these boxes, respectively (*Id.*).

   a.      The Debtor believed that by including the references to his wife and the trust, he informed the recipient that the financial statement included more assets than just those that he personally owned (Tr. 108:18–20).

b.      O'Neil agreed that this information put him on notice that some assets on the financial statement may have been owned by the Debtor's trust or Jane Morrell (Tr. 39:14–24).

I.      In his personal financial statement, the Debtor listed various assets and liabilities (Exh. 2). The financial statement suggests that his net worth was more than $42.5 million when it was prepared on December 30, 2020 (*Id.*).

J.      The personal financial statement is extremely detailed. For simplicity, I will focus my discussion on the most relevant information.

K.      Approximately $30 million of the assets were the Debtor's ownership interests in various LLCs and companies (*Id.*). Extracting value from these assets in the event of default would have been difficult, such that they might not have substantially affected O'Neil's decision to invest (Tr. 74:2–11; 128:11–17).

L.      In the asset section of the financial statement, there is a column meant to describe ownership of the assets (Exh. 2). Some rows indicate that the assets are owned by the Debtor's trust, others identify assets owned by the Debtor individually, and one states that an asset is owned by Jane Morrell's trust (*Id.*).

a.      The rows for a Mercedes Benz ML550 and a Cadillac Escalade include a column that says "KEVIN INDIV.," indicating that the Debtor owned these assets (*Id.*). The row for individual retirement accounts and similar assets is marked as belonging to "JANE TRUST" (*Id.*). Cash in the amount of $800,000 and "Note Receivables & other business investments" are identified as being owned by "KEVIN TRUST" (*Id.*). Half of the marketable securities are in the name of the "JANE MORRELL REVOCABLE TRUST" and the other half in the name of the "KEVIN MORRELL REVOCABLE TRUST" (*Id.*).

b.      The remaining assets listed in this portion of the financial statement, however, have blank spaces in the column meant to indicate ownership (*Id.*).

M.      The Debtor conceded that his personal financial statement contained incomplete information in light of the blank spaces in the ownership column (Tr. 156:2–8).

N.      Three parcels of real property stood out to O'Neil when he reviewed the financial statement (Tr. 16:10–15). These are the "Primary Residence" with a value of $6.5 million, the "Secondary Residence" with a value of $375,000, and 22 acres of "Residential Zoned Land" valued at $2.5 million (Exh. 2). The ownership column is blank for each of these three properties (*Id.*).

O.      At the time the financial statement was prepared, all three properties were owned by Jane Morrell or her trust, not by the Debtor (Tr. 98:16–24, 100:22–24, 183:7–9).

P.      The financial statement also includes personal assets valued at $700,000 (Exh. 2). The only detail provided is "Jewelry, Furniture, etc" (*Id.*). There is no indication of ownership of these assets (*Id.*). Testimony established that this category of assets consisted largely of household goods purchased with the Debtor's earnings (Tr. 120:12–15). In his bankruptcy case, the Debtor took the position that substantially all of this personal property belonged to Jane Morrell, but he acknowledged that no transfer documents or other written evidence supported that contention (Tr. 115:7–10, 123:3–11).

Q.      Considering the modest value of used household goods and furnishings, even in a luxury home, and the lack of detail provided in the financial statement, it is unlikely that the personal assets identified on the financial statement were material to O'Neil's decision to invest in GS Vista LLC.[1] But even if they were, the personal assets are not materially different from the real estate for purposes of the issues discussed here. I thus will focus primarily on the real estate below.

R.      O'Neil did not ask for any additional documentation related to the real estate listed on the financial statement, nor did he conduct a title search (Tr. 45:17–25, 46:1–9). He did not ask any questions about the blank spaces in the financial statement or otherwise attempt to clarify asset ownership (*Id.*). Interpreting the blank spaces to indicate the Debtor's ownership, O'Neil believed that all assets on the financial statement were owned by the Debtor individually unless stated otherwise (Tr. 46:16–21; 80:17–23).

S.      The Debtor has provided the same or a similar personal financial statement, showing assets belonging to his wife and to him, to at least fifty other lenders, creditors, and investors without incident (93:12–16, 135:1–7). None of these other parties ever inquired about the blank spaces on the financial statement (Tr. 135:3–7). However, one bank required a personal guaranty from Jane Morrell in addition to the one provided by the Debtor (Tr. 156:22–25, 157:1–4).

---

[1] As it turns out, the personal property included some items that might have had substantial value to the holder of a guarantee, such as a Steinway piano (Tr. 171:24–25). But the financial statement did not identify the piano, or any other particular item of property, as an asset (Exh. 2).

T.      The Debtor conceded that a personal guarantee could be of lesser value to its holder if the assets on the financial statement were not owned by the guarantor (Tr. 127:19–25, 128:1).

U.      Despite not owning all of the assets on his financial statement at the time he provided it, the Debtor believed that his financial statement accurately reflected his net worth at the time (Tr. 128:2–10). He stated that the vast majority of his net worth arose from the real estate held by various companies and LLCs that he had an ownership interest in, which might have been worth $42 million at the time (Tr. 128:9–10).

V.      The testimony from O'Neil and the Debtor revealed other divergent assumptions about the financial statement.

    a.      O'Neil viewed the personal guaranty and the personal financial statement together, such that the assets on the financial statement were the ones that he could pursue in the event of default (Tr. 73:1–24). He believed that any assets owned by a guarantor but not listed on a financial statement would be exempt from collection (Tr. 82:4–13).

    b.      The Debtor believed that he was supposed to include all assets within his possession or control, including those assets legally owned by his wife, on the personal financial statement that he provided along with his personal guaranty (Tr. 90:8–12, 92:21–25). He viewed the financial statement as reflecting the collective assets owned by his wife and him, whether separately or jointly owned (Tr. 97:3–8). He also asserted that he has never been told to include only his individually owned assets on his financial statement (Tr. 105:3–11).

W.      The respective views of O'Neil and the Debtor about the construction, legal significance, and content of a personal financial statement are idiosyncratic, but they appear to be genuinely held.

X.      Beginning in 2022, GS Vista LLC did not fully pay its obligation to O'Neil (Tr. 23:6–13). Rising prices of lumber and various other factors led to the failure of the apartment project (Tr. 216:13–25).

Y.      O'Neil sent GS Vista LLC a demand letter on February 9, 2024, seeking payment from GS Vista LLC and mentioning the Debtor's guaranty (Tr. 24:10–20). O'Neil has not been paid since sending this demand letter (Tr. 25:2–11). At trial, he estimated that he was owed more than $3.7 million (Tr. 26:16–21).

Z.       As previously stated, three witnesses testified at the trial: the Debtor, Jane Morrell, and Kevin O'Neil. I find the testimony of all three witnesses to be credible in all respects relevant to my findings and conclusions here.

The following are the Court's **CONCLUSIONS OF LAW**:

1.       The Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b) because all claims in this adversary proceeding arise under Title 11 and are related to the bankruptcy case of the Debtor.

2.       This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). In any event, all parties have consented to the entry of a final judgment by the undersigned.

3.       O'Neil asserts that the debt owed to him by the Debtor should be excepted from discharge under Section 523(a)(2)(B) of the Bankruptcy Code. O'Neil has the burden to establish his case by a preponderance of the evidence. *See In re Hernandez*, 860 F.3d 591, 602 (8th Cir. 2017); *First National Bank v. Pontow*, 111 F.3d 604, 608 (8th Cir. 1997). "Exceptions to discharge under § 523(a) are to be strictly and narrowly construed against the creditor and liberally in favor of the debtor to facilitate the debtor's fresh start." *In re Evans*, 584 B.R. 20, 26 (Bankr. E.D. Mo. 2018).

4.       O'Neil must establish that the Debtor obtained the investment through the use of a statement in writing (i) that was materially false; (ii) respecting the Debtor's financial condition; (iii) on which O'Neil reasonably relied; and (iv) that the Debtor caused to be made or published with intent to deceive. 11 U.S.C. § 523(a)(2)(B).

5.       The written statement does not need to be physically prepared by the debtor; rather, "the writing requirement is satisfied if the written statement was signed, adopted and used, or caused to be prepared by the debtor." *In re Keogh*, 509 B.R. 915, 932 (Bankr. E.D. Mo. 2014) (cleaned up). A "statement respecting the debtor's financial condition" may concern only a single asset. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 725 (2018).

6.       It is undisputed that, before O'Neil decided to invest with GS Vista LLC, the Debtor provided him with a written statement respecting the Debtor's financial condition.

7.       A statement is materially false if it "paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit." *In re Schnuelle*, 441 B.R. 616, 623 (B.A.P. 8th Cir. 2011). This requires the court to ask three questions, two objective and one subjective. First, is the picture painted by the financial statement substantially untruthful? *See id.* Second, does it involve a misrepresentation of the type which would normally affect the decision to extend

credit? *See In re Beck*, Adv. No. 10-4418, 2013 WL 145589, at *5 (Bankr. E.D. Mo. Jan. 14, 2013). And third, would the creditor have extended credit if it had been apprised of the debtor's true financial situation? *See id.; In re Leavitt*, 399 B.R. 892, 895 (Bankr. W.D. Mo. 2008); *In re Dammen*, 167 B.R. 545, 551 (Bankr. D.N.D. 1994); *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985), *overruled on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991).

8.      The answers to the second and third questions are straightforward. Whether a guarantor owns or does not own millions of dollars of real estate is an issue that would normally affect the decision to extend $2.5 million in credit. And O'Neil credibly testified that he would not have made the investment in GS Vista LLC if the Debtor's financial statement accurately reflected that he did not own the real estate and other assets.

9.      The first question is not much more difficult, considering the facts of this case. The Debtor's financial statement included three parcels of real estate that were valued at approximately $10 million in total. The Debtor did not own any of these assets at the time he provided the financial statement; they were all owned by his wife or her trust, neither of which was to be a guarantor. Including almost $10 million worth of real estate that he did not own on his personal financial statement materially overstated his wealth and created a substantially untruthful picture of his financial condition.[2]

10.     The Debtor asserts that the financial statement was not materially false, just incomplete. He contends that references to his wife and her trust put parties on notice that some of the assets on the financial statement might belong to her. The Debtor argues that he did not misrepresent ownership of the assets because he did not make any representation about ownership by leaving blank spaces on the financial statement.

11.     However, the Debtor is incorrect in his assertion that omissions cannot make a financial statement materially false. It is "well established that writings with pertinent omissions may be materially false for purposes of § 523(a)(2)(B)." *In re Shawver*, No. 18-47063, 2020 WL 1486780, at *3 (Bankr. E.D. Mo. Mar. 23, 2020) (cleaned up), *aff'd*, No. 4:20-CV-00820, 2021 WL 4504417 (E.D. Mo. Sept. 30, 2021); *see also In re McCleary*, 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002); *In re Durham*, 639 B.R. 504, 532-33 (Bankr. E.D. Ark. 2022).

12.     The Debtor provided the financial statement, along with his personal guaranty, as support for O'Neil's investment. In this context, the financial statement allowed O'Neil to assess the Debtor's ability to repay him. The nature and value of the assets that could be

---

[2] O'Neil suggested in his testimony that the Debtor's financial statement was false in other respects, but these claims were not included in his complaint or further pursued at trial (Tr. 49:11–24, 50:1–18, 152:9–25, 153:1–11). I thus will not discuss these issues further.

pursued in the event of a default would matter to a reasonable investor, and O'Neil would not be able to pursue assets owned by Jane Morrell, who was not contemplated to be a guarantor. Therefore, failing to disclose the Debtor's non-ownership of the $10 million of real property is a pertinent and material omission.[3]

13.     This case is similar to *In re Bohr* from the Bankruptcy Court for the Western District of Missouri. *See* 271 B.R. 162 (Bankr. W.D. Mo. 2001). In that case, the court determined that the financial statements submitted by the debtors were materially false because they stated that they were the only owners of their residence, even though the mother of one of the debtors had a life estate in the property with full power to sell the residence. *Id.* at 167-168. The court noted that a misrepresentation occurred when the debtors represented current, instead of future, ownership of the property. *Id.* at 167. The debtors' interest in the property had no value as long as the mother was alive, making the misrepresentation material, because "[t]he inclusion of the real estate vastly overstated the Debtors' net worth and gave the Bank a grossly distorted and inaccurate picture of the Debtors' financial condition." *Id.* at 167.

14.     Likewise, the Debtor listed three pieces of real property on his financial statement that were owned by his wife or her trust, not by him. The $10 million worth of real estate accounted for a significant portion of the assets on the financial statement. Because the Debtor did not clarify that he did not have an ownership interest in this property, his financial statement painted a substantially inaccurate picture of his assets.

15.     Section 523(a)(2)(B) also requires reasonable reliance by the creditor on the materially false statement. *Field v. Mans*, 516 U.S. 59, 68 (1995); *Keogh*, 509 B.R. at 932. "The plaintiff must demonstrate both that it actually relied upon the false financial statement and that its reliance was reasonable under the circumstances." *In re Koester*, 437 B.R. 363, 368 (Bankr. E.D. Mo. 2010).

16.     O'Neil's testimony established that he actually relied on the Debtor's financial statement in deciding to invest with GS Vista LLC.

17.     Although the Debtor suggested that a sophisticated real-estate investor like O'Neil would also rely on project details, this point is inconsequential, because partial reliance

---

[3] This proceeding does not require me to determine whether an obligor makes a materially false statement when he accurately describes ownership of property that may, nevertheless, not be available to a creditor, such as an asset owned by a guarantor and his non-guarantor spouse as tenants by the entirety. *See generally Otto F. Stifel's Union Brewing Co. v. Saxy*, 201 S.W. 67, 71 (Mo. 1918).

is sufficient. *See Koester*, 437 B.R. at 369 ("Partial reliance is all that is necessary; the financial statement need only be a contributing cause to the decision to extend credit.").

18.    The reasonableness of a creditor's reliance is determined in light of the totality of the circumstances. *See First National Bank*, 111 F.3d at 610; *Schnuelle*, 441 B.R. at 624. "A court may consider whether there were any red flags that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *In re Jones*, 31 F.3d 659, 662 (8th Cir. 1994) (cleaned up).

19.    Although a creditor may rely on some financial statements without further inquiry, blind reliance on a financial statement that is "materially and obviously incomplete and ambiguous" is not reasonable. *In re Keim*, 236 B.R. 400, 403 (B.A.P. 8th Cir. 1999).

20.    As discussed, the Debtor's personal financial statement was missing information about the ownership of real property worth approximately $10 million, causing the statement to be materially inaccurate. These omissions were readily apparent from the face of the financial statement.

21.    The same issues that caused the financial statement to be materially inaccurate, as discussed above, also served as red flags that counseled further investigation by O'Neil. This is not always the case—it is possible for a financial statement to be thoroughly false but coherently constructed—but here the financial statement both implied that the Debtor owned the real estate and suggested that he did not.

22.    Although O'Neil assumed that the blank spaces signaled that the Debtor owned the assets, that does not explain why other assets owned by him were clearly labeled as such. In context, the blank spaces created uncertainty about the Debtor's ownership interest, if any, in the remaining assets.

23.    The omissions surrounding asset ownership and reference to Jane Morrell as a joint party on the financial statement were red flags that would put a reasonable creditor on notice that the Debtor may not have owned all assets on the financial statement. He may, instead, have been answering a question that O'Neil had not asked: what assets do you and your wife collectively own? Given the uncertainty surrounding ownership of the real estate valued at $10 million, a reasonable investor would have inquired further. O'Neil could have sought clarification from the Debtor or conducted a title search, and minimal investigation of this sort would have revealed the inaccuracies in the financial statement.

24.    "Additionally, the stringency of the reasonableness standard varies with the lender's sophistication." *Shawver*, 2020 WL 1486780, at *4 (cleaned up). O'Neil testified

about his decades of investing and stated that he had invested in twenty to thirty apartment projects. By any measure, he is a sophisticated investor who was well-positioned to recognize the missing information and other unusual aspects of the financial statement and to inquire further.

26. I therefore conclude that O'Neil failed to prove by a preponderance of the evidence that he reasonably relied on the Debtor's financial statement.

26. In light of this conclusion, it is not necessary for me to reach the issue of intent to deceive.

27. For these reasons, I conclude that O'Neil did not establish all the elements of his claim under Section 523(a)(2)(B). A separate judgment will be entered accordingly.


Dated:  July 6, 2026
St. Louis, Missouri
cjs

_____
Brian C. Walsh
United States Bankruptcy Judge